2002 ME 18

**MAINE FARMERS EXCHANGE, INC.**

v.

**FARM CREDIT OF MAINE, A.C.A.**

Supreme Judicial Court of Maine.

Submitted on briefs: June 12, 2001.
Decided: Feb. 5, 2002.

David A. Dunlavey, Esq., Phillips, Olore, Dunlavey & York, P.A., Presque Isle, for plaintiff.

Michael S. Heann, Esq., Bangor, for defendant.

Panel: SAUFLEY, C.J., CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.
DANA, J.

CLIFFORD, J.

[¶ 1] Farm Credit of Maine appeals from a judgment entered in the Superior Court (Aroostook County, *Pierson, J.*) in favor of the Maine Farmers Exchange (MFX) on its setoff claim against Farm Credit's security interest in Nightingale Enterprises, Inc.'s (NEI) account receivable representing proceeds from the sale of potatoes. MFX cross-appeals that part of the judgment denying MFX's claim against Farm Credit for unjust enrichment. Farm Credit contends that the court erred in concluding that MFX had a right to a setoff pursuant to 11 M.R.S.A. § 9–318 (1995) because MFX's interests in NEI's account receivable was subject and inferior to Farm Credit's rights as a secured creditor. We disagree and affirm the judgment.

[¶ 2] Farm Credit loaned approximately $735,000 to Gordon Wathen, Glendon Wathen, and Lynn Wathen, potato farmers, and to NEI, a corporation solely owned by Gordon Wathen, for the 1995–96 potato growing season. NEI leased equipment, bought potatoes from the Wathens, and then stored, packed, and resold the potatoes. Farm Credit secured the loan with a security interest in the potato crop and proceeds with the expectation that proceeds from the sale of the crop would be used to satisfy the loan.[1] Farm Credit notified the buyers, shippers, and packers of potatoes of its security interest in the crops and inventory of NEI. The Wathens sold their crop to NEI in 1995–96, with the express condition that proceeds from NEI's resale of the potatoes would be paid to Farm Credit.

[¶ 3] The security agreement required Farm Credit's written authority prior to NEI selling the potatoes.[2] In practice, however, only oral discussion took place between Farm Credit and NEI as to how NEI would market the crop and contract for the resale of the potatoes, and Farm Credit did not require NEI to get specific approval to sell the potatoes during the 1995–96 season. NEI sold most of its potatoes to MFX, a corporation in the

1. A crop loan is one made with the specific intent that the loan money be used to plant, harvest, store, and sell the fruit of the crops.

2. The security agreement provides:
It is understood that the use of the terms "proceeds", "substitutions", "replacements", "accessions" and "additions" does not give the Debtor authority, express or implied, to sell or otherwise dispose of the Collateral, unless Debtor is hereafter specifically authorized to do so. The within grant of a security interest is in addition to and supplemental of any security interest

previously or herewith granted by the Debtor to the Secured Party.
Another portion of the agreement states that:
Without prior written consent of Farm Credit: (1) Debtor will not sell, lease, transfer, assign or otherwise dispose of any of the Collateral, nor permit any liens, security interests or encumbrances to attach to any of the Collateral, except in favor of Secured Party; and (2) Debtor will not remove any of the Collateral or books and records pertaining thereto from the location(s) specified in Section (1) above.

business of buying and reselling potatoes. MFX was aware of Farm Credit's security interest in the 1995–96 crop. The price that MFX paid was for bagged potatoes. MFX would pay NEI between thirty and forty days after taking delivery by checks made out jointly to Farm Credit and NEI.

[¶ 4] On February 1, 1996, MFX advanced $100,000 to NEI to allow NEI to take advantage of a favorable payment arrangement offered by the Maine Potato Growers, Inc. MFX and NEI agreed that NEI would make weekly payments to repay the loan by deducting the amount from what MFX owed NEI for future potato sales. NEI had the understanding that the $100,000 was not a loan, but rather an advance to NEI to be repaid from the future sale of the potatoes to MFX. The record is not clear as to the extent of Farm Credit's knowledge of this financing agreement, and MFX acknowledged that these arrangements were made without Farm Credit's direct involvement.

[¶ 5] By late 1995 and early 1996, both of NEI's two bag vendors declined to extend further credit to NEI. MFX agreed to facilitate NEI's purchase of bags from those same vendors by permitting NEI to charge the bags to MFX's open account. MFX planned to deduct the amount due for the bags from each shipment invoice for the potatoes it received from NEI. At the request of NEI, however, MFX maintained the account for the bags separately and did not deduct the cost from NEI's account, as long as NEI "[paid] for the bags in about the same manner that [they] would have made the deduction." The agreement required MFX to pay NEI the total price for the bagged potatoes and NEI would then write MFX a check for the bags NEI purchased on MFX's open accounts with the bag vendors.

[¶ 6] MFX also indicated that it "would always keep enough money in [NEI's] ... potato account to deduct the [cost of the] bags, provided [NEI] didn't pay for them." MFX did not charge NEI more for the bags than NEI would have otherwise paid to the bag vendors.[3] MFX became a creditor of NEI and maintained a separate book account for the bags provided to NEI. It is unclear whether Gordon Wathen informed Farm Credit about this arrangement.

[¶ 7] NEI did not make the bag payments to MFX and built up a large account payable due to MFX for the bags. MFX then agreed to keep a running account on the amount due for bag reimbursement and to deduct the payment from invoices at a later time in a similar fashion as it was doing for the $100,000 advance. MFX charged fourteen percent interest on the outstanding bag debt. MFX attached a summary of deductions to the joint checks it made out to NEI and Farm Credit, but NEI never forwarded the itemizations to Farm Credit.

[¶ 8] Farm Credit eventually became aware that NEI was not selling at a price sufficient to cover expenses. MFX appeared on every accounts payable list submitted to Farm Credit, and Farm Credit recognized, in the early spring of 1996, that MFX was becoming a substantial creditor of NEI. Farm Credit began adjusting the release price[4] based on NEI's

---

3. An employee of NEI testified that NEI received more for the potatoes they sold bagged than they would have received for potatoes sold in bulk. It was common practice in the industry for potato growers to be responsible for providing bags to pack the potatoes for shipment.

4. A release price is the minimum amount which must be paid to a crop lender from each crop sale proceeds check to ensure satisfaction of the crop loan.

accruing payables and the monthly financial summaries showing predictions for the remaining unsold crops. The credit arrangement between NEI and MFX, which allowed MFX to deduct from crop sale proceeds the value of the bags sold to NEI on MFX's credit, prevented Farm Credit from calculating an accurate net value of the remaining crops.

[¶ 9] Farm Credit became concerned and discussed with Gordon Wathen the need to pay the accruing sums. Farm Credit witnesses at trial did not recall that they received an explanation as to the specifics of the accounts payable to MFX, or why they were increasing. Gordon Wathen also did not recall telling Farm Credit specifically about the need for the bags and the arrangement with MFX, but believed there was some discussion.

[¶ 10] NEI satisfied the $100,000 advance to MFX in May 1996, but requested that MFX wait to deduct money owed for the bags in order to assist NEI with its cash flow. MFX made its last crop purchase from NEI on May 29, 1996, and did not use its credit account to pay for more bags after April 1, 1996. MFX set off from its June 7, 1996, payment to NEI and Farm Credit for the purchase of the potatoes the $92,270.59 that NEI owed MFX (including accrued interest) for the bags that NEI bought on MFX's credit.

[¶ 11] NEI and the Wathens commenced bankruptcy proceedings in July of 1996.

Farm Credit received relief from the automatic stay in order to pursue a claim, as a secured lender, against MFX for the sums that MFX had set off.[5] MFX filed a complaint with the Bankruptcy Court seeking a declaratory judgment regarding its rights and claiming priority for its setoff from what it owed to NEI. Following the transfer of the case to the Superior Court, Farm Credit filed a counterclaim, asserting that its security interest gave it priority over MFX's claim, and prayed that the court hold MFX liable for crop sale proceeds and for punitive damages.

■ [¶ 12] The Superior Court found that MFX's setoff claim arose out of its potato contract with NEI, and, relying on 11 M.R.S.A. § 9–318, concluded that Farm Credit's security interest was subject to the setoff claim of MFX. The court entered a judgment in favor of MFX on its setoff claim in the amount of $92,270.59. Farm Credit appealed, and MFX appealed the court's ruling that MFX had not met its burden to prove the elements necessary to make out a claim for unjust enrichment.[6]

[¶ 13] Title 11 M.R.S.A. § 9–318 provides a limited right to a setoff for a party in the position of MFX, a right that can be superior to the security interest of a secured party in the position of Farm Credit, if the subject matter of the setoff arises out of and is part of a contract between an account debtor and assignee.[7] The statute provides:

**5.** The money Farm Credit claims it was due from NEI at the time of trial was between $138,000 and $165,863.80.

**6.** The law permits recovery for the value of a benefit retained when there is no contractual relationship if fairness and justice compel performance of a legal and moral duty to pay. *Forrest Assoc. v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 14, 760 A.2d 1041, 1046. To sustain a claim for unjust enrichment, MFX must show that (1) it conferred a benefit on Farm Credit, (2) Farm Credit had an appreciation

or knowledge of the benefit, and (3) the benefit was under such circumstances to make it inequitable for Farm Credit to retain the benefit without payment of its value. *See id.* at ¶ 14, 760 A.2d at 1045–46.

The court did not find that Farm Credit appreciated or had knowledge of the benefit, the second prong of the test required to sustain an unjust enrichment claim.

**7.** Even though Article 9 usually refers to a creditor with a security interest as a "secured party," a secured party with a security inter-

Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 9–206, the rights of an assignee are subject to

(a) All the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(b) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

11 M.R.S.A. § 9–318(1) (1995).

[¶ 14] The Superior Court correctly applied the terminology used in section 9–318 to the potato contract between MFX and NEI, and identified MFX as an account debtor (from its purchase of potatoes for which it has not paid), NEI as an assignor (from the assignment of its right of payment for the sale of potatoes), and Farm Credit as an assignee (from the assignment to it of the right to receive payment for the sale of the potatoes).[8] Under section 9–318(1)(a),[9] Farm Credit's security interest was subject to "[a]ll the terms of the contract between the account debtor [MFX] and the assignor [NEI] and any defense or claim arising therefrom." Farm Credit's rights as assignee in this case, however, would be subject only to the terms of a single contract for the sale of potatoes between NEI and MFX, but not to the terms of contracts separate from that single contract. *See Harris v. Dial Corp.*, 954 F.2d 990, 993 (4th Cir.1992)

(stating only single contract brings setoff claim within protection of Article 9).

[¶ 15] The issue presented to the Superior Court was whether the agreement to allow NEI to purchase bags on MFX's account was part of the potato contract, or was a separate agreement. If it was a separate contract, Farm Credit's security agreement would not be subject to it, and MFX's rights would be inferior to Farm Credit's security interest. Because MFX was aware of Farm Credit's security interest in the potatoes, it was MFX's burden to show that its right to a setoff arose pursuant to section 9–318(1)(a). In order to succeed, MFX had to prove that its agreement to advance credit to NEI for the bags arose out of and was part of the contract with NEI to buy and sell potatoes. *See In re Apex Oil Co.*, 975 F.2d 1365, 1368, 1370 (8th Cir.1992). The court found in favor of MFX, reasoning that the credit for bag purchases agreement did arise out of and was part of the potato contract between NEI and MFX. Accordingly, the court concluded that, pursuant to section 9–318, the rights of Farm Credit as the assignee were subject to all the terms of the potato contract between NEI and MFX, including that part of the agreement for the purchase of bags, and that MFX properly offset the costs for the bags from the monies it owed to NEI.

[¶ 16] The intent of the parties and the expectation of performance are crucial to determining whether a single

---

est in accounts is the "assignee" under section 9–318. *See In re Otha C. Jean & Assoc. Inc.*, 152 B.R. 219, 222–23 (E.D.Tenn.1993) (noting that "courts have generally applied § 9–318 this way.")

**8.** Section 9–318(1) provides a creditor with a limited right to a setoff relating to a perfected security interest. 11 M.R.S.A. § 9–318(1) (1995); *see also In re Otha C. Jean*, 152 B.R. at 222 (explaining applicability of Article 9 to

setoff); *Harris v. Dial Corp.*, 954 F.2d 990, 993 (4th Cir.1992) (only single contract brings setoff claim within protection of Article 9); *In re Apex Oil Co.*, 975 F.2d 1365, 1368 (8th Cir.1992) (noting applicability of Article 9).

**9.** Because MFX had notice of the assignment from NEI to Farm Credit, section 9–318(1)(b) does not apply.

contract or separate contracts exist. *Robbins v. State Tax Assessor*, 536 A.2d 1127, 1129 (Me.1988) (reviewing intent of parties to interpret contract); RESTATEMENT (SECOND) OF CONTRACTS § 240 cmt. b (1981);[10] *see also Carvel Co. v. Spencer Press, Inc.*, 1998 ME 74, ¶ 10, 708 A.2d 1033, 1035 (reviewing severability or entirety of contract for clear error). A determination by a court relating to the contractual intent of the parties is a question of fact, and we review such a finding for clear error. *See Forrest Assoc. v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 9, 760 A.2d 1041, 1044; *Carvel Co.*, 1998 ME 74, ¶ 10, 708 A.2d at 1035; *Ludington v. La-Freniere*, 1998 ME 17, ¶ 5, 704 A.2d 875, 877; *Dehahn v. Innes*, 356 A.2d 711, 716–17 (Me.1976). Accordingly, we will defer to a trial court's findings of fact unless such findings are clearly erroneous. *In re Estate McCormick*, 2001 ME 24, ¶ 18, 765 A.2d 552, 559; *Paffhausen v. Balano*, 1999 ME 169, ¶ 11, 740 A.2d 981, 983 (relying on competent evidence in record to affirm trial court's findings); *Estate of Plummer*, 666 A.2d 116, 118 (Me.1995) (deferring to lower court's finding that preemptive right was reasonable); *Blackmer v. Williams*, 437 A.2d 858, 863 (Me.1981) (acknowledging trial court's superior capability of determining credibility of witnesses and resolving conflicts in testimony); *Porges v. Reid*, 423 A.2d 542, 544 (Me.1980) (giving considerable deference to presiding justice's set aside of default because of familiarity with case and superior position to evaluate credibility of parties). Our function as an appellate court is not to "review a cold transcript and draw [our] own factu-

al inferences" but to determine whether the record contains competence evidence to support the trial court's factual conclusions. *Sturtevant v. Town of Winthrop*, 1999 ME 84, ¶ 9, 732 A.2d 264, 267 (citation omitted).

[¶ 17] The court found that the evidence "establishes that the intent of the agreement between MFX and NEI was for the packaging and selling of NEI's potatoes for the 1995–96 season.... NEI was obligated to sell MFX its potatoes to repay the $100,000 loan. When NEI could not obtain potato bags, MFX was indirectly obligated to allow NEI to charge the bags to MFX's account if it wanted to have the $100,000 advance repaid out of the future potato sales from NEI." There is competent evidence in the record to support that finding, and we discern no clear misapprehension of the significance of the evidence. It is common practice in the industry for the grower or seller of potatoes to provide bags in the sale of potatoes, and such was the case with the contract between NEI and MFX. The parties intended NEI's provision of the bags to be an integral part of their original potato contract. Allowing NEI to charge MFX's account for the bags resulted in NEI being able to fulfill the contract according to its original terms. MFX also originally suggested handling the money NEI owed for the bags as a deduction in the amount MFX owed NEI for the potatoes. Accordingly, we find no clear error in the finding of the court that the agreement to supply credit for the purchase of bags was an integral part of a

---

**10.** Separate contract are discussed in a comment to section 240:

 If there are two separate contracts, one party's performance under the first and the other party's performance under the second are not to be exchanged under a single exchange of promises, and even a total failure of performance by one party as to the

first has no necessary effect on the other party's duty to perform the second.... This is not so, however, if there is a single contract under which the parties are to exchange performances ....

RESTATEMENT (SECOND) OF CONTRACTS § 240 cmt. b (1981).

single contract. *See Carvel Co.*, 1998 ME 74, ¶ 10, 708 A.2d at 1035.

[¶ 18] Farm Credit contends that the bag agreement between NEI and MFX was a separate contract because NEI was not required to purchase the bags from MFX and NEI used the bags to supply some orders to other buyers. The purchase of potatoes by MFX from NEI, however, was an ongoing contractual relationship that occurred before the open account system for the bags was initiated. Although NEI may have found alternative ways to acquire the bags, it was necessary for NEI to get the bags quickly to fulfill its obligation to sell bagged potatoes to MFX. Moreover, although some of the bags purchased through MFX's credit account were used by NEI for buyers other than MFX, that use was minimal. Nor does the fact that NEI originally wanted to keep a separate account for the bags and to pay for them by check mandate a finding that the bag agreement was a wholly separate contract.

[¶ 19] Farm Credit's contention that the open account arrangement was made prior to subsequent crop purchases by MFX also does not require a conclusion that the trial court erred. Regardless of when they accrue, claims and defenses arising out of a contract from which assigned accounts are created may be asserted by the account debtor as offsets against the amount owed to the assignee. *United Cal. Bank v. E. Mountain Sports*, 546 F.Supp. 945, 963, 977 (D.Mass.1982) (declaring running account part of single contract even for claims based on unrelated transactions because that result consistent with course of dealing between assignor and account debtor).

[¶ 20] This case is similar to *Harris v. Dial Corp.*, 954 F.2d 990 (4th Cir.1992), where the court found that one contract covered both the sale of resin by a bottle purchaser to a bottle manufacturer and the sale of the bottles by the bottle manufacturer to the bottle purchaser. The court subsequently allowed the amounts owed by the purchaser for the purchase of bottles to be offset against amounts owed by the bottle manufacturer for the purchase of resin. *Id.* at 993. Resin was necessary for the manufacturer of the bottles, and the purchaser supplied the manufacturer with the required resin when the manufacturer could not obtain the resin itself. *Id.* The court specifically found that the resin agreement was "inseparable from the bottle agreement because [the manufacturer] could not have made the bottles without the resin, and it could not get the resin except from [the purchaser]." *Id.* (reviewing divisibility of contract as matter of law).

[¶ 21] Although the court could have concluded that the credit arrangement for the bags was separate from the contract to sell potatoes, we cannot say that the court erred in its factual conclusion that that agreement arose out of and was part of the contract for the sale of potatoes. *See Paffhausen*, 1999 ME 169, ¶ 11, 740 A.2d at 983 (refusing to vacate lower court finding simply because court could reach different conclusion).

[¶ 22] Because we uphold the Superior Court's conclusion that MFX had a right to the setoff pursuant to 11 M.R.S.A. 9–318(1), we need not address MFX's contention that MFX took the potatoes it purchased from NEI free and clear of any security interest of Farm Credit. *See* 11 M.R.S.A. §§ 9–306(2), 307(1) (1995 & Supp.2001) *repealed by* P.L.1999, ch. 699, § A–1 (effective July 1, 2001). Nor need we decide whether the trial court erred when it concluded that Farm Credit was not unjustly enriched by MFX's extension of credit to NEI, which allowed NEI to continue to fulfill its potato contract and

thus continue to pay down its loan to Farm Credit. *See Forrest Assoc.*, 2000 ME 195, ¶ 14, 760 A.2d at 1045–46.

The entry is:

Judgment affirmed.

SAUFLEY, C.J., and DANA, J., concurring in part and concurring in the judgment.

[¶ 23] We concur in the result but write separately to address the question of the security interest in the goods that the Court has declined to reach. We agree with the Court's conclusion that MFX had the right pursuant to former 11 M.R.S.A. § 9–318(1)(a) (1995)[11] to set off the amount NEI owed it for the potato bags against the account receivable for potato purchases owed to NEI and assigned to Farm Credit; although a different characterization of the facts would have been possible, the Superior Court's finding that the bag debt arose out of the potato contract is not clearly erroneous.

[¶ 24] We do not agree, however, that our decision on the section 9–318 setoff issue makes it unnecessary to consider the separate question of whether MFX took the potatoes free of Farm Credit's security interest. This separate issue must be considered. However, because Farm Credit has failed to establish that its security interest survived, we concur in the result.[12]

[¶ 25] An inventory or crop lender like Farm Credit that has not received the full proceeds of a sale of collateral typically has two potential claims against a buyer of the collateral. One claim sounds in contract: to the extent that the buyer has not paid the full price for the collateral, the secured lender, as the assignee of the account receivable created by the credit sale, may sue the buyer to collect the balance due on the account—subject, however, to the buyer's defenses to the extent allowed by section 9–318(1). The second potential claim is independent of the first, and involves the goods themselves: "so long as the security interest still continues in the inventory, the secured party can maintain an action against the purchaser for repossession or conversion." *United States v. Handy & Harman*, 750 F.2d 777, 786 (9th Cir.1984) (discussing secured party's different remedies); *see also Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185 (7th Cir.1990) (considering propriety of setoff against account but not considering conversion of collateral claim not properly raised before trial court); *Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal.App.3d 638, 242 Cal.Rptr. 914 (1988) (considering separate conversion and setoff claims); *Mid–States Sales Co. v. Mountain Empire Dairymen's Ass'n*, 741 P.2d 342 (Colo.Ct.App.1987) (considering only conversion claim because secured party did not challenge setoff against account).

---

**11.** All references in this opinion to the secured transactions article of the U.C.C. will be to the former Article 9, 11 M.R.S.A. §§ 9–101 to 9–507 (1995 & Pamph.2000), which governs this case, but which has been repealed and replaced as of July 1, 2001, with new Article 9–A, 11 M.R.S.A. §§ 9–1101 to 9–1709 (Pamph.2001).

**12.** Because Farm Credit has not established MFX's liability on either the setoff or the security interest issue, we agree with the Court that we need not consider the unjust enrichment issue raised by MFX, which, although characterized by the Superior Court as a "claim," was really more in the nature of an affirmative defense to liability. *Cf. Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal. App.3d 638, 242 Cal.Rptr. 914 (1988) (holding beet buyer who wrongfully set off harvesting costs in violation of section 9–318 and converted beets in violation of continuing security interest nevertheless not liable because liability would unjustly enrich secured party).

[¶ 26] Farm Credit brought a contract claim against MFX as assignee of NEI's account receivable,[13] and we have now affirmed the Superior Court's conclusion that MFX was not liable to Farm Credit on the account because it had a valid setoff arising from the contract. Farm Credit also brought a claim alleging that MFX had converted its collateral, which is discussed in the parties' briefs on appeal but not in the opinion of the Court nor in the decision of the Superior Court.[14] If Farm Credit is correct in its contention that MFX took the potatoes subject to its security interest, then it would be entitled to recover the remainder of the price of the potatoes as damages for conversion, notwithstanding MFX's valid setoff against the account receivable. For this reason, it is necessary to discuss whether Farm Credit's security interest in the potatoes [15] survived the sale to MFX.

[¶ 27] Article 9's default rule is that the security interest survives: "Except where this Article or Article 8 otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof, unless the disposition was authorized by the secured party in the security agreement or otherwise . . . ." 11 M.R.S.A. § 9–306(2) (1995). The first question, then, is whether NEI's sale of the potatoes to MFX was authorized by Farm Credit. It is clear that the sale was not authorized by the security agreement, nor in writing as provided by the security agreement; at the same time, it is clear that Farm Credit knew that NEI was selling nearly all its potatoes to MFX, and never objected. On this basis, MFX argues that Farm Credit gave its implied consent to the sale. Farm Credit, however, argues that its consent was conditioned on its receiving from MFX (via a check payable, as usual, to NEI and Farm Credit) the full price of the potatoes, which it never received due to MFX's unauthorized setoff.

[¶ 28] Farm Credit may have the better argument on this issue. The evidence in the record could be read to support a finding that Farm Credit's consent was conditional and that the condition was not satisfied. A number of courts have held that when a condition that the lender receive the full price of the collateral is not satisfied, the sale has not been "authorized by the secured party" within the meaning of section 9–306(2). See Churchill Bus. Credit, Inc. v. Pac. Mut. Door Co., 49 F.3d 1334, 1338 (8th Cir.1995) (majority rule is that "a security interest in collateral con-

---

13. Although Farm Credit's counterclaim did not clearly state a contract claim on the account receivable, it is evident from the record and the arguments on appeal that this claim was tried by consent of the parties pursuant to M.R. Civ. P. 15(b).

14. Although the Superior Court did not explicitly address the conversion claim, Farm Credit asserts—correctly, we will assume for purposes of argument—that the court made an implicit finding that MFX took the potatoes free of Farm Credit's security interest.

15. Farm Credit also argues that it had a security interest in the funds that MFX withheld as a setoff for the bag debt, instead of paying to NEI, because that money was proceeds of the

potatoes. Proceeds, however, are defined as "whatever is received upon the sale . . . of collateral." 11 M.R.S.A. § 9–306(1) (1995) (emphasis added). Proceeds need not be received by the debtor, Farnum v. C.J. Merrill, Inc., 264 A.2d 150, 156 (Me.1970), but they must be received by someone, and the money MFX withheld for the setoff was not received by anyone, see Branch Banking & Trust Co. v. Columbian Peanut Co., 649 F.Supp. 1116, 1119 (E.D.N.C.1986) (no proceeds created when buyer set off peanut seed debt against price of peanuts). On the other hand, the money MFX received when it resold the potatoes clearly was proceeds thereof, and if Farm Credit had a continuing security interest in the potatoes, it had a security interest in those proceeds as well.

tinues where the conditions of release imposed by the secured party are not met"); *accord Tri–State Livestock Credit Corp. v. Ellsworth (In re Ellsworth),* 722 F.2d 1448, 1450–51 (9th Cir.1984); *N. Commercial Co. v. Cobb,* 778 P.2d 205, 208–09 (Alaska 1989); *but see E. Idaho Prod. Credit Ass'n v. Idaho Gem, Inc.,* 122 Idaho 946, 842 P.2d 282, 285 (1992) (lender's authorization to sell collateral conditional on its receiving proceeds cut off security interest though condition not met). We need not resolve this issue, however, because, as we discuss below, Farm Credit cannot prevail even if one assumes that it did not authorize the sale to MFX.

[¶ 29] MFX argues that if Farm Credit did not authorize the sale, MFX still took free of the security interest because it was a buyer in the ordinary course of business: "A buyer in the ordinary course of business ... other than a person buying farm products from a person engaged in farming operations, takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." 11 M.R.S.A. § 9–307(1) (1995). Farm Credit apparently relies on the farm products exception to the buyer in the ordinary course rule contained in section 9–307(1) to support its contention that MFX took the potatoes subject to its security interest. This argument fails for two reasons. First, as MFX points out, it did not buy farm products from a person engaged in farming operations. NEI was not engaged in farming operations, and thus the potatoes in its hands were inventory, not farm products. 11 M.R.S.A. § 9–109(3), (4) (1995). Second, although the parties do not mention it, the farm products exception in section 9–307(1) has been preempted by the federal Food Security Act (FSA), 7 U.S.C.A. § 1631(d) (1999). *See Food Servs. of Am. v. Royal Heights, Inc.,* 123 Wash.2d 779, 871 P.2d 590, 594–95 (1994) (en banc) (purpose and effect of FSA is to abrogate U.C.C. farm products exception); *accord Nelson v. Am. Nat'l Bank,* 921 S.W.2d 411, 416 (Tex.App.1996). Although the FSA itself contains three exceptions pursuant to which a buyer of farm products in the ordinary course may take subject to a security interest, 7 U.S.C.A. § 1631(e), Farm Credit failed to persuade the trial court of the existence of any of those exceptions.

[¶ 30] Nor did Farm Credit assert either of two alternative arguments on this issue. First, assuming that MFX was a buyer in the ordinary course, it only follows that it took the potatoes free of the security interest *created by its seller.* 11 M.R.S.A. § 9–307(1). Farm Credit could have argued, therefore, that MFX's seller was NEI, not the Wathens, so that MFX took free of the security interest created by NEI but subject to the security interest created by the Wathens.[16] *See Cent. Wash. Bank v. Mendelson–Zeller, Inc.,* 113 Wash.2d 346, 779 P.2d 697, 702 (1989) (en banc) (apple buyer did not take free of bank's security interest because it bought from sales agent, not farmer who created security interest; buyer liable to bank for conversion); *Baker Prod. Credit Ass'n v. Long Creek Meat Co.,* 266 Or. 643, 513 P.2d 1129, 1132 (1973) (en banc) (buyer of cattle carcasses from slaughterhouse did not take free of security interest created by feed lot and was

---

**16.** The security interest created by the Wathens presumably survived the initial sale from the Wathens to NEI because, although Farm Credit obviously consented to that sale, there is no reason to believe that it consented to a sale free and clear of that security interest.

*See* 11 M.R.S.A. § 9–306, U.C.C. cmt. 3 ("If the disposition ... was authorized by the secured party subject to the secured party's security interest, the transferee will not acquire the collateral free and clear of the security interest.").

thus liable for conversion). There is case law, however, cited by MFX in its brief, holding that when a buyer in the ordinary course purchases crops from farmer-owned processor, both the farmer and the processor are treated as "his seller," so that the buyer takes free of the security interest created by both. *First Bank of N.D.—Jamestown v. Pillsbury Co.*, 801 F.2d 1036, 1039–40 (8th Cir.1986); *United States v. Cont'l Grain Co.*, 691 F.Supp. 1193, 1200 (W.D.Wis.1988). A reasonable resolution of this conflict appears to be that disregarding the separate entity of the farmer-owned processor is only proper when the elements of "piercing the corporate veil" can be met, *Deutsche Credit Corp. v. Case Power & Equip. Co.*, 179 Ariz. 155, 876 P.2d 1190, 1195 (1994), and it is clear that those elements have not been demonstrated here, *see generally Johnson v. Exclusive Props. Unlimited,* 1998 ME 244, ¶¶ 4–9, 720 A.2d 568, 570–72 (outlining elements).

[¶ 31] Second, and more significantly, Farm Credit has not successfully challenged MFX's assertion that it was a buyer in the ordinary course of business. A buyer in the ordinary course is defined in the U.C.C. general definitions in section 1–201(9), which provided: [17]

> "Buyer in the ordinary course of business" means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind .... "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but *does not include a transfer* in bulk or as security for or *in total or partial satisfaction of a money debt.*

11 M.R.S.A. § 1–201(9) (1995) (emphasis added). In the section 9–307 context, courts have construed this definition to mean that to qualify as a buyer in the ordinary course, one must give "new value" for the goods purchased, rather than setting off a preexisting debt against the price of the goods. *Branch Banking & Trust Co. v. Columbian Peanut Co.*, 649 F.Supp. 1116, 1118 n. 2 (E.D.N.C.1986) (peanut purchaser was not buyer in ordinary course because it set off against purchase price the amount that farmer owed it for peanut seed); *Handy & Harman,* 750 F.2d at 782 ("[A] buyer of goods on credit cannot qualify for ordinary course status under § 1201(9) if he subsequently offsets his promise to pay with a debt that was in existence at the time he bought the goods."); *Producers Cotton Oil,* 242 Cal. Rptr. at 923 (beet purchaser who set off harvesting costs not buyer in ordinary course because "[n]o new value was given"); *see generally* 9 WILLIAM D. HAWKLAND ET AL., HAWKLAND UNIFORM COMMERCIAL CODE SERVICE § 9–307:02 (1997) ("[T]he purchaser must give new value if he or she wants to be a buyer in ordinary course."). It appears that MFX failed to give new value for the potatoes it purchased from NEI to the extent of the setoff it took for the bag debt. To that extent, therefore, MFX would not have been a buyer in the ordinary course; Farm Credit's security interest would have continued in the potatoes; and MFX's purchase and subsequent resale of the potatoes, and retention of the resale proceeds, would have been a viola-

---

17. The definition of buyer in the ordinary course of business in section 1–201(9) has been revised, in ways not relevant here, con-currently with the adoption of Article 9–A as of July 1, 2001. *See* 11 M.R.S.A. § 1–201(9) (Supp.2001).

tion of Farm Credit's security interest for which MFX would be liable to Farm Credit for conversion. Because Farm Credit did not assert these arguments, however, the Superior Court did not err when it implicitly found that MFX took the potatoes free of the security interest.[18]

[¶ 32] In sum, the litigants' focus on the contract claims resulted in reduced attention to other remedies that ordinarily may be available to secured creditors. Article 9 is meant to provide this complementarity of remedies. If a buyer of collateral gives full value, the secured party can be satisfied out of the proceeds—whether obtained from the debtor or by suing the buyer on an assigned account receivable—and need not retain its security interest in the goods themselves. On the other hand, if the full proceeds are not available to the secured party because the buyer has made a legitimate setoff against the account receivable, the buyer will not have given new value and the security interest will remain in the collateral itself, to be enforced by an action for conversion or replevin. The result in this case, therefore, should not be seen as leaving secured parties without a remedy, but only as properly denying a secured party the one remedy it asserted effectively, but to which it was not entitled.

18. Alternatively, if the court made no implicit finding but simply failed to make findings on the security interest issue at all, any error in so doing was harmless.